Good morning, Your Honors. May it please the Court, I am Juan Luis Garcia of the firm Nixon Peabody, attorneys for the appellant and cross-appellee insurance company of the State of Pennsylvania. For short, I will refer to it as ICSOP, and I will refer to the appellee, cross-appellant, as American or American States. And I'd like to reserve three minutes for rebuttal. Your Honors, the District Court erred in three fundamental ways that I'd like to discuss with you today. First, the District Court misapprehended the plain and literal meaning of the defense provision in the ICSOP umbrella policy by failing to consider that the words claim and property damage are defined terms in the policy, and by failing to consider whether there was a coverage gap for property damage that each moonlight fire claimant alleged. Secondly, the District Court erred by intermingling or merging what should have been separate inquiries, one being the strictly contractual inquiry of whether umbrella coverage was triggered, and secondly, the very separate analysis that applies under common law rules for primary insurance once umbrella coverage becomes primary. And thirdly, Your Honors, the District Court erred by disregarding the full extent of the indemnity coverage that was available from American. First, American not implicitly but explicitly made an intentional waiver of any exclusions or limitations of its coverage, and that was a contractual waiver that superseded any limitations on its coverage. And secondly, the District Court disregarded the broad coverage that was available, apart from the liability plus endorsement, under what's known as an insured contract. And that means basically the indemnity contract between Howell and Sierra, which became insured by American, and therefore American assumed that duty to On your waiver argument, I had trouble with that because it seemed like California does think that an insurer can agree to defend and maybe will waive a claim against the insured but not against other insurers. I was looking at Mitchell Silberberg for that. How do you distinguish Mitchell? Well, Your Honor, I think there's two issues, right? In insurance law, there's a common notion of implicit waiver, which is when an insurer takes a certain action that's inconsistent with denying coverage at a later time. For example, an insurer may undertake the defense and fail to issue a reservation of rights. I would consider that an implicit waiver. Here, we didn't even have that. We had an express, an explicit contractual waiver. But only as to Sierra, right? Why would it be as to other insurers? Well, Your Honor, I think we have to look at this practically. For example, I would like to pose a hypothetical of, instead of defense coverage, dealing with indemnity coverage. And for this purpose, because for defense, there were no applicable limits. So it didn't matter what the relative limits were. So for this hypothetical, I would ask you to consider that the American indemnity coverage didn't have any limits of insurance. It only had the limitations that might otherwise apply under its endorsement. In that scenario, if American expressly waived its limitations of coverage as to indemnity and said, we will pay all theories of liability in the judgment, and the judgment came due, it wouldn't make sense for American then to backtrack and say, well, no, no. We said we owed 100 percent, but not anymore because we have this limitation in coverage. And that's essentially what happened here, where you have a practical inconsistency that matters for purposes of the equitable contribution claim because the whole reason that American believes was the coverage gap was based on its coverage defenses. And those coverage defenses, Your Honor, were applicable only to indemnity. So it's very important. Well, I mean, you say they were only applicable to indemnity, and I want to make sure I understand your argument, because the gap, as I understand it, is that American said, we will cover Sierra for vicarious liability claims, but not for non-vicarious liability claims, because they were an added insurer to the policy. And so how does that not create a gap? And is that the gap you're talking about? No, Your Honor. So I think there's a lot of issues that interplay here, but I think this becomes simpler if we break it down step by step under rules of contractual interpretation and what the precedents teach. So the analysis that American is proposing is an analysis that applies to primary insurance, right? So in the case of primary insurance, totally independent from whatever the policy might say, there is a common law rule that implies a duty to defend for any potential indemnity coverage. So in the case of primary insurance, you look for a potential that an insurer may have to indemnify. And the reason the courts do that, Your Honor, is because the actual duty to indemnify is not really triggered until the insurer has a judgment against him or her, or there is a settlement agreement. At that time, then you know the insurer is legally required to pay this sum, and the insurance company has to pay it. But at the defense stage, you don't know that yet. So the courts came up with this common law rule looking to potential for indemnity. But that, Your Honors, doesn't make sense as a plain contractual question for reading when an umbrella coverage is triggered as a contractual matter. And that's what I'd like to walk through. Yeah, and maybe I can just tell you how I view it, and then you can tell me why I might be wrong. As I view it, you tried to write this generally. There's no question that your policy is written as a secondary policy, but it's also written, would you agree, as a potential primary policy in certain circumstances. There's umbrella coverage that may be triggered contractually, sure. Well, but umbrella policy, as I normally umbrella policy is secondary to primary coverage, right? Yes, Your Honor, and I think that's right. But do you disagree that your policy in certain circumstances, where the claims are not covered by other insurance, it steps into, it falls down, I guess is the term that the courts use, to primary coverage? Of course, and that is the intent of umbrella coverage, Your Honors. It's not, umbrella coverage is insurance for when you have no coverage. And that is... But if you fall down, do you disagree that you fell down to primary insurance in any capacity in this case? In this case, we do disagree, Your Honor, because, as I mentioned in the second error that I identified in my introduction, the district court collapsed what really were separate inquiries. And I'd like to walk through, so the case law teaches that the step-down question of umbrella coverage is strictly contractual. And so you have to look to the literal plain meaning of the terms. Well, but why, so explain to me why I agree with you that it's contractual. American has a policy that says we indemnify for vicarious liability claims. This suit, these series of suits, how many were there, by the way? I believe five, but I'll credit to you an exposure of a billion dollars. So, regardless, there's no debate that they had vicarious liability claims and non-vicarious liability claims. So at some point, in an undefined amount, you were, you stepped down to a primary insurance position. Well, Your Honor, I want to turn to the language of the policy, because I think that's really what matters. I think first, let's turn to the defense provision, because that's really what's at issue. That's what, American's analysis tries to make umbrella coverage be sort of this primary alternate insurance that applies for whenever there's a defense by the primary, and that's not the case. Umbrella coverage is available under the terms of the language of the policy and the words matter, Your Honors. Yeah, let's go to the words. What are you looking at? Are you looking at your contract or American's? We're looking at, I'm looking at our policy, Your Honor. Is this ER 338? Yes, correct, 338. So explain to me why you do not owe a duty to defend under Part B. Of course. If you go to subsection B1, subsection, little b, why is that not satisfied to trigger your, your coverage? I'll be happy to, Your Honor. So I think the first key word here is actually above A, which is the word claim. We shall have the right and duty to defend any claim or suit seeking damages covered by the terms and conditions of the policy. And you don't, but you don't, you agree that the claims or suits that were involved are covered by the terms of your policy. Right, that's not, that's not an issue. The issue is whether there was a gap, right? And the word claim, very importantly, is defined by the policy to mean a demand for payment. It doesn't mean a cause of action or a theory of liability. So you're looking, is there a demand for payment or a lawsuit, right, that alleges cover damage? And by the way, it uses the word damages twice, right? So we have a rule against surplusage. So we're already looking at damages that are potentially within the scope of the policy. And then if we look at Part B, we can eliminate the words that are not really in dispute, right? We can eliminate the words bodily injury. We can eliminate personal injury. We can eliminate advertising injury. And we can eliminate the phrase covered by this policy because, Your Honor mentioned, we don't dispute that it would otherwise be within the scope of the policy. So the key language becomes damages are sought for property damage not covered by any underlying insurance. But there's no dispute, it seems, that there are at least some amount of unspecified damages that are not covered by any other insurance. Well, that's the issue, Your Honor. We're looking, that changes the analysis. I know that this can be, it's a lot of various issues together, right? But let's separate them out. This doesn't say damages not covered. It says the rule against surplusage requires us to look at the words property damage not covered. And I submit to you, Your Honor, that looking at other cases concerning umbrella insurance, for example, I submit that the case of North American Capacity Insurance has similar language. In that case, that was an umbrella policy that was held not to drop down even in a mixed claim situation, right? American here claims that this is a mixed claim situation because there are some theories of liability that are covered and some that are not. The same was true in North American Capacity. There, I mean, that's to go into the weeds, but there was some endorsement that removed coverage for some theories of liability based on some, on the work of certain subcontractors, but there was coverage under others. And the key language in that case, Your Honors, was whether, the way that was phrased, it meant that there was an exclusion for any injury that is subject, the subject of coverage of underlying insurance. And like here, the key word was injury, which is the subject of coverage. In that case, it didn't matter whether there were theories of liability that were not covered. The length, in other words, the word covered, the covered meant, is it within the terms of the defined term, property damage. Property damage is well understood. But this is property damage, right? It's burned trees. Sure. Right. So how is that not property damage? No, no. We don't disagree that it's property damage, but it was all indivisible property damage that was within the scope of the defined, a defined property damage under the American policy. But couldn't, I mean, I guess your point is you can't separate the, some of the trees from other trees. Right. But I don't know why you would need to. I mean, if the fire is 10 percent because of direct liability and 90 percent because of the subcontractor's liability, then maybe you kind of imagine that 10 percent of the trees are burned because of the direct liability. I don't understand why you couldn't think of it that way. Well, I submit that you cannot, Your Honor, because it was, because that's inconsistent with the contractual. The contractual language says the property damage not subject to coverage. And at the point when this is meant to be triggered is before any, there's any indemnity obligation, right? So at this point, Sierra has not been held liable. Howell has not been held liable. The understanding and intent is whether the injury, you may have different types of injuries. For example, in a defamation case, you just have reputational injuries. Some policies cover reputational injuries, some don't. You may have injury to property, like in a typical tort case. And for example, we give the example in our brief that if a Sierra employee had crashed against a building of a third party, that would be a separate property damage, not within the scope of the method. And I agree with you if that were all we're dealing with. But again, we're dealing with both vicarious and non-vicarious, and we don't, because it was settled out, we have no idea, but it seems clear that there were at least both claims in there. I just don't see how your argument holds weight on that. Can I add, I don't want to cut you off, but in the interest of time, can I turn you to But I'm concerned because when you read the cases, CSC and travelers insurance, and I'll give you a chance to turn there first. This is the other insurance provision. So it seems like public policy says we've got to go up front to the specific language and you can't put the specific language up front and then come back to this general language in subsection K and just say, well, if you're covered by any other insurance, then we don't have a duty to defend. And I'd be interested in your response to that. Sure, Your Honor. And there's actually a case from this court from last year called Attain Specialty Insurance Company versus Sierra Pacific Management Company. It's an unpublished decision at 725 Federal Appendix 557, issued in 2018, in which this was a policy purchased and issued as primary. But there was an access-only provision that made that policy access over the additional insured coverage provided by another party. That, Your Honor, I submit, is an example of the fact that access-only provisions are not disfavored. There are, I would point your attention to the case of Olympic. Hold on. They clearly are disfavored. I mean, California law has said they're disfavored. I think your case is helpful. I'll go look at it. I don't think I've seen it. What I was trying to figure out is there's a difference between disfavored and unenforceable. But my general gist was, look, if you've got – do you know whether there were specific provisions up front in the Attain Specialty case? Were there specific provisions of coverage and duty to defend up front? Up front, it was issued as a primary policy. It was clearly marked as a commercial general liability policy, which had – Oh, and we held that it was – It became access. And it matters because the – really, I mean, you can look at the labels, right? They can be informative. But you can also look at the promise to indemnify. A typical primary CGL policy states that they will pay all sums or those sums that the insured is legally required to pay. An access or secondary type policy will say they will pay those sums in excess of a retained limit or some other condition for which the insured is held liable. So that policy was a primary typical CGL policy. And I just disagree, Your Honor, with the terms of disfavored. There's – we're turning attention to the case of Olympic Insurance, which we cite in our brief, that points out that there are three different types of typical other insurance clauses. There are escape clauses, which say that the coverage becomes null and void if there is other coverage available. So that eliminates – That's what you have. That's not what we have, Your Honor. That's an escape clause, and that is disfavored and unenforceable. There is an access-only policy that says – that doesn't eliminate coverage. Coverage is still there for judgment. It just says we will be access over underlying insurance. And Olympic – the case of Olympic Insurance makes clear that that is not disfavored. In fact, when a policy is purchased and underwritten as a secondary policy, there is no public policy reason to disregard the contractual terms of the policy, Your Honors. And I do want to stress that the words matter a lot here, Your Honors. There are many public policy notions in the insurance world, but words matter because these are products that are crafted from words and language. And the people who buy them and underwrite them depend on the literal and straight interpretation of those words. Is this a uniquely crafted policy, or is it – are we dealing with fairly standard type of provisions? I would say this is issued from a standard – what's called an ISO standard policy. So I expect, you know, insurers can select different standard-type forms. And we haven't found a case that interpreted this particular language, Your Honors. But I submit that the North American Capacity Insurance case interpreted a very similar language because there – as here, Your Honors, there was a mixed claim situation where there was a whole percentage of damages that would not be covered by primary insurance. And nonetheless, the court of appeals of California held that that was not the trigger for umbrella coverage.  But I actually want to ask – sorry, did you have another question? I'd like to ask you about prejudgment interest, and I'll still give you a couple minutes for rebuttal. But on prejudgment interest, you argue that American is not entitled to prejudgment interest because there were factual issues at play here, essentially. But I think this was all decided on cross motions for summary judgment. So I don't understand if you have cross motions for summary judgment, how you can be saying that there are factual disputes. That is correct, Your Honor. But there is an essentially different nature to equitable jurisdiction that, for example, on a permanent injunction or on a preliminary injunction, may require – in certain circumstances, the district court may grant that on the papers. In some cases, it may be required to have a trial or an evidentiary hearing, even though it's subject to the discretion of the court, because the facts must be viewed in the light most favorable to the opposing party. In this case, there were multiple facts, Your Honor. There was a whole issue of – that was hotly disputed as to whether American actually provided a full and complete defense. American – Sorry. Let me just – so I'm not sure I understand how you're responding to this cross motions for summary judgment. So cross motions for summary judgment assume we can decide this on the law because the facts are not disputed. So what is your response to that? Well, Your Honor, we believe the language of the defense provision is clear, and we are looking strictly at that language because we believe there was no gap for property damage. Just as in North American capacity insurance, there was no gap for the injury. But if the language is not clear, Your Honors, the parties are entitled to submit extrinsic evidence of intent about the nature of umbrella coverage versus primary. There were a lot of issues that American has briefed that were not developed in the record despite being factually disputed. And one of them, you can consider whether American provided a full and immediate defense. There were multiple briefs when Sierra sued American – and I see I'm over my time. If I may just finish this answer – in which Sierra claimed that American delayed over a year in reimbursing any defense invoices. Sierra – Are you basically saying if you didn't win, then you think there were fact disputes? I mean, both sides were saying there are no fact disputes. That's how you were presenting it to the court for a decision at that point. And it was on decision on all issues, right? It wasn't like we'll argue about prejudgment interest later, was it? Well, Your Honor, I believe it was on the issue of duty to defend, right? So American only moved on – there was a declaratory judgment action – I'm sorry, a declaratory judgment cause of action with respect to the duty to defend. American submitted a summary adjudication motion. That was granted. But that was only partial. But the pre-judgment interest comes out of the duty to defend, right? The pre-judgment interest is about the defense cost. It comes after there's an equitable allocation, right? In this case, if VIXOP was not in the picture, there's no question that American owed a full and complete duty to defend Sierra for every dollar spent until that policy was exhausted. The question then becomes an equitable one of shifting some of that burden over to another insurer. And that becomes an equitable allocation question, Your Honor, to which there's a lot of discretion. The standard for pre-judgment interest is certainty of calculating the damages owed. And when there is significant discretion, even if it was on summary judgment, there were disputed facts. They may have not been material in the mind of Judge England to his equitable allocation, but nonetheless, there were disputed facts that were relevant or potentially relevant to that equitable allocation, Your Honor. And we do – and I do want to point out that we do ask in the alternative for remand because the decision ultimately was decided on the clarity of the defense provision, right? That is what was held to apply. If Your Honors are not inclined to reverse on that basis, we do ask for remand because we believe the parties are entitled to submit extrinsic evidence on the intent of that language as well as on multiple disputed questions, including the fact that VIXOP participated in the defense, that there was a real question disputed about whether American itself afforded a full and complete defense, and the case law teaches that an equitable contribution claim requires considering all defense costs that were paid, and that is supported by the Scottsdale decision of Judge Kroski that was cited by Judge England in his equitable allocation decision. It says that the – Yeah, I think we've taken over your time, so I think I better cut you off. We'll give you two minutes for rebuttal. All right. I appreciate it, Your Honors. Thank you. Thank you. Okay. I guess we're uncrossed, so that's fine. Yes. So, ICHSOP issued a policy that provided both excess and primary insurance coverage. Because ICHSOP issued a policy over no scheduled underlying insurance and no self-insured retention for its domestic operation, it operated as the equivalent of a $10 million commercial general liability policy. But you agree that the only reason that they arguably fell down to primary was because of the gap for non-vicarious liability potential against Sierra. Is that right? Absolutely. Okay. Yes. That really is the gap. And I don't want to cut you off, but I know, can you go to the ER 361 and tell me on that other insurance, do you, council just made some arguments about why that's not disfavored under public policy because this isn't the same type of excess policy or disclaimer that exists in other cases. Do you agree with that? What's your response to that? I don't agree, and I'm glad you're jumping to that. I was almost going to do that myself just to kind of cut to it. There's four reasons why that doesn't apply. The courts in both interstate fire and traveler's casualty had made it clear that in order to negate a duty to defend, you have to expressly, clearly, and conspicuously do so. That clause is absolutely silent on the duty to defend. So that one clause can't by itself in those general terms take away a specific grant of coverage on that duty to defend, and that's what the cases make clear. What about this attained specialty? I hadn't looked at that case before. Are you aware of it? This is the first time I'm hearing about it this morning, Your Honor. So I'd have to look at it myself, but it seems contrary to some of the authority both out of California as well as out of the Ninth Circuit because the cases, as Your Honor recognized, generally disfavor these clauses. And this is a different type of clause than what I think counsel is referring to, and I think a great way to illustrate that is to look at the other insurance clause in Americans' umbrella policy. So if you look to ER 228, I'm not sure if you have that handy, but in Section E2, what it states there is when this insurance is excess, we will have no duty to defend the insured against any suit if any other insurer has a duty to defend the insured against that suit. So that's an example of where in an other insurance clause can, what the courts require, expressly, clearly, and conspicuously negate the duty to defend. That's where arguably sometimes it works. I don't know if you're trying to catch up with me. No, if you're good. Yeah, absolutely. So that's ER 228. So that gives you an example of a time where another insurance clause actually negates the duty to defend. The ICHSOP policy doesn't do that. It doesn't negate that duty to defend. I'm sorry? No. No, I think you've answered my question on that. Let's assume that we say ICHSOP. I mean, this is an interesting dynamic. ICHSOP, as I understand it, is just arguing we have zero liability, nothing. They haven't really made any alternative arguments, but it sounds like both parties are arguing that the district court abused its discretion in ordering equal shares. If we assume that ICHSOP, and it's just an assumption, but if we assume that ICHSOP has some liability here, why do you believe that the district court abused its discretion in ordering equal share? On equal share, and that's because the court's rationale for doing so, as far as not awarding a policy limits approach, is inconsistent with its later findings. That seemed to be your strongest argument. Because as I analyze that point, I'm reading the cases that seem to unify. There's a little bit of disconnect in some of the cases. But, I mean, first of all, California Supreme Court hasn't weighed in on this, right, on what the appropriate equitable formula is. Is that correct? Well, there is. The courts say there is no one set formula. There are six recognized methodologies. The courts do say that the policy limits approach is the most widely used, and that makes sense, right? I mean, that's just the common sense notion that if you've got more potentially at risk, you're going to pay more for the defense. Otherwise, if you don't, if you say, hey, look, you've got these insurers. They all have this contractual and prophylactic duty to defend. Let's just do it evenly. Well, I mean, then you're completely eliminating one of the recognized methodologies if you do that. Well, you're not. You're just choosing. I don't really understand this argument because it seems like California courts have said there is no one methodology. It's kind of an equitable assessment. And once you're in an equitable assessment, I think we're under an abusive discretion kind of review. And as long as the district judge does something that seems somewhat reasonable, it seems like usually we would affirm. And coverage, I don't think, has one single meaning. So you're saying coverage is the dollar limits. But it seems like another way to think about it is how often will it be triggered. And that's basically what the judge said, is I think this umbrella policy is not going to be triggered as often. So they're not. I'm sorry. That's actually your argument, isn't it? Did I just get it backwards? You're trying to say that they're – I'm sorry. Now I'm a little – I've confused myself. So the district court divided it evenly, right, saying that now both of them have some duty here. I'm just going to divide it evenly. So, I mean, that's an equitable thing to do. Not totally a crazy thing to do. Well, it really – but it ignores some of the case law out there, which talks about, you know, what is going to most equitably distribute the obligation among the insurers pro rata in proportion to their respective coverage of the risk. But I think that's Judge Friedland's point. How do you figure out up front in policies like this what coverage of the risk is? I mean, it seems like an impossible task. Because you can't just take the $10 million versus the $1 million. Well, you could. That would be one way to do it. But the $10 million is triggered in a completely – I shouldn't say completely different way, but there are differences in when that would apply. So my take on this as I was reviewing it is, well, there would have to be some discount for that $10 million. I don't know what it would be. We could send you back and have experts come in and analyze that. This seems not helpful when you're dealing in an equitable. Your best argument – I guess what I'm trying to say, and I tend to agree with Judge Friedland here, is that in the normal world there's six allocations for when you can do it. He chose one. Right. And it's not wrong to say this is impossible to figure out. You know, equitable seems right, equitable distribution. We're just going to split it 50-50. There's not a lot of cases that do that, but there are some. Your argument, and this is maybe what you can address, because I think you're right about this, that the district court – the question is when he makes assumptions or factual findings or reasons for why there's discounts that would be appropriate to ICHSOP's liability here, or potential liability under the $10 million versus $1 million, when those are wrong or they are contradicted by the district court itself, does that then make it an abuse of discretion? I mean, should we send it back and say, listen, you were inconsistent. This ruling you said X. This ruling you said Y. You've got to go back and be consistent, and maybe you can justify this better on the equal apportionment. But what should we do with that? At what point does it become abuse of discretion? Right, and that's our argument, is that the two underpinning, the two rationales for the court's decision – the court later addressed that and said, you know what, actually, not in these exact words, but that was incorrect. Sierra faced $1 billion in exposure, and it didn't matter if it was on one claim for direct liability or 44 claims on vicarious. It didn't matter. The court also explained that, look, it's an umbrella over no scheduled underlying insurance for direct liability, and so it's going to function, have the functional equivalent of a $10 million CGL policy. And so in that instance, at that point, there's no real factual underpinning. There's no real basis for the court's original ruling that rejected that policy limits. I got myself a little twisted around in my last question, but it seems like under abuse of discretion, there are a lot of ways to look at it, which I think is how I got myself twisted around. So one is, let's just divide it evenly. One is, how likely is the coverage to get triggered? Another is, what are the dollar limits? I mean, it seems like the judge could have chosen any of those. They all have some merit to them. Now, maybe your point about contradicting yourself later is the judge didn't explain well enough, but so do you think we really need to remand just so the judge can explain better? No, because I think that the court's later finding actually supports the policy limits approach. The court later recognized those two key really salient points, and because of that, because of that finding, that's what supports the policy limits approach in this case. But it seems like, I mean, you're saying he contradicted himself, but to reverse, do we need to just think there is no explanation that could have been given for an equal division? I'm not sure you're really making an argument that there's no way to justify an equal division. I just haven't heard it, Your Honor. That's my issue. And to me, I look at it this way. The fact that they provided 10 times more in coverage, it has to mean something. Well, it's 10 times more in coverage, but it's only triggered less often. So, I mean, why can't you just multiply the fractions? Because they actually paid it. They actually paid $10 million to resolve these claims. Yeah, but the duty to defend is based on, this is the issue. Because if you go down that route, you should be in here arguing you guys don't even have a duty to defend. You didn't make this argument. But your policy says you only have to pay for their vicarious liability actions. There was no finding of vicarious liability here. But my point is, I would throw that. I'm assuming you made a conscious decision not to make that argument because for the same reason that we can't accept the argument you just made, which is you've got to look at this up front. And you can't look at it in hindsight and say, well, they ended up having to pay $10 million. You have to look at it up front and say, what is the contractual obligation that they took on? For the duty to defend, I agree with you. You look up up front. For equitable contribution, once everything is the dust has settled, then you do take a look back. That's the difference. You do look back and you do take a look. That doesn't seem like what the California courts say, though, in their rule on equitable contribution. They seem to say, what are the risks that are being bought into up front by the parties? I would disagree. I think if you look at the court, like, for example, in Scottsdale and some of the other cases, what they're trying to do is trying to achieve equity. And they're doing it after the fact. They're doing it after everyone's already paid. And that's the reason why we felt that we should be awarded prejudgment interest. There were no issues. Everything was paid. The reason why I disagree with that is because say, for example, this had been $6 million in liability. You paid $1 million. They paid $5 million. If you read the cases, they talk about policy limits. They don't talk about the amount paid out. At least I haven't seen a case that's looked at the amount paid out. They all talk about what's the policy limits. So ICHSOP, in that scenario I just gave, I don't think would be able to. I mean, they could argue. And maybe a district court would find it equitable and say, well, you only paid out on 50% of your total liability, so we're only going to calculate that amount of contribution. And that would be one of the factors to consider, absolutely. And that's the thing is the court is looking at the big picture, is looking at all different factors. They're looking at, well, what are the limits? They're looking at, well, did the carriers provide different coverage? You know, when did the loss? Was it a loss that happened at one set point in time, or was it lasting over multiple policies? There's a number of factors that the courts look into. But the point is they're looking at it after the fact. They're looking at it after everyone's already paid. They're looking at it. They're looking at the limits. They're looking at, you know, at the nature of the claims. They're doing this, and they're doing it as a forensic look, you know, in trying to achieve that equity. And they're trying to say, well, what is the most equitable result here? And are you looking at cases that are doing equitable distribution for the liability division or for the duty to defend division, like defense cost division? Because for defense cost division, I don't really understand how it makes sense to do it after the fact, because you're supposed to defend when you don't even know it's only potential liability. So true, and I understand. There's so many different – I think some of the cases you're citing are liability cases, not defense costs. Some of them are indemnity, yes. Some of them deal with settlement, and some of them do deal with the duty to defend. But the rules are generally the same. And the rules are looking at, again, they're looking at it after the fact. But, I mean, do you have a case that says that defense costs should be looked at after the fact? Because it really feels like they should be looked at not after the fact. But how does one do that? Because the claims just procedurally, the way these cases play out, is you have an insurer that's provided with a defense, that case resolves, and then the carriers then sue each other. Well, no, no, clearly it gets litigated after the fact, but based on information from before the fact. Right, right. I mean, based on the policies, not based on these factual things that happen later, right? Right. Yeah, no, it is, again, it's going back and looking at all the facts that were issued, looking at the different policies, and not starting from square one like you would on a duty to defense. So I'm reading the test that seems to be, I mean, like I say, there's a few different tests. But the California Court of Appeals in, this one's Scottsdale, a trial court must determine which method of allocation will most equitably distribute the obligation among the insurers pro rata in proportion to their respective coverage of the risk. But coverage of the risk, it has to be looking based on what they contracted at the beginning. Because it doesn't make sense, I mean, your duty to defend is dependent upon what everybody's anticipating going in. It can't be at the end, because then, I mean, that doesn't take into account the full statistical analysis that went into issuing the insurance policy in the first place. So this language, the respective coverage of the risk, explain to me how that would be backwards looking instead of forwards looking. Well, based upon how Your Honor is viewing it, I can see your point. I can see you're looking at this as, you know, just what do the policies provide? And here, so if we do that, if we look just what do the policies provide, and we have one policy that provides $10 million in coverage and one that provides one, then argument is the most equitable allocation would be this, what's really 11 to 1 ratio, right? And so that's the point. And that's what the, in Continental and the other cases which talk, the reason why they say that, you know, the policy limits is the most widely used and appropriate is because it actually takes into account what you're covering. You're taking into account the extent of your potential exposure. But that's one of the six ways, and there's a whole bunch of variations on that, and I think rightfully so, because as we've, I don't want to repeat what we've already discussed, but there clearly has to be a discount given here, because it's just not exactly the same risks that are being taken on. Of that $10 million, they assumed, going into this, that a certain percentage, could have been 10%, could have been 90%, they didn't know in any particular circumstance, would be excess coverage and they wouldn't have a duty to defend. So you've got to give, it seems to me, you've got to give a discount factor for that. And ultimately what the district court did was said, yeah, there's a discount factor, I don't know. I mean, what did you want him to do? Did you want him to call experts in? I mean, that's the only way I could look at this. I mean, yes, it could always be done better, but that's the whole point of equity is he's taking his best stab at it, and he actually, I think, articulated the right reason. I think you make a good point, which is later on you find something different, which is odd, and I'm not entirely sure what to do with that, but I don't know if that makes it abusive discretion on this particular finding. No, I understand the dilemma, Your Honor. I've taken him over. I want to ask you another thing, so I'll still give you time for rebuttal, but can I go to this $150 contribution for the lawyers that they made for the defense costs? So I know you're trying to say that the district court was right to ignore the $150 payments, the $150 an hour payments that they made, but as I understand it, and maybe you can correct me if I have this wrong, there was a dispute about whether $150 an hour was enough for the law firm that was defending Downey, and that dispute was settled between your client and Sierra, right? That's not in the record, Your Honor. They brought a claim because they sought, they argued that American was refusing to give up the defense. We took the position that because, you know, we accepted it without a reservation, that we have the right to control the defense at that point, which is a contractual provision. They argued that, well, no, because you're only covering our vicarious liability, there's a conflict that entitles us to independent counsel, and that was the issue. They said, well, we're entitled to independent counsel. But part of that was how much should they be paid is my understanding. No. I thought there was a demand. I thought there was some, they were arguing we should get $260 an hour and not $150 an hour. Well, I mean, they can say that, but the statute only requires us to pay what we would normally pay our panel counsel, and it was undisputed that we only pay panel counsel $150 an hour. I mean, that's your position. But my understanding is their position was we need more than that. This is a harder case or something. And so what I'm trying to figure out is when I look at the record, it seems like at ER-896, the settlement agreement of that dispute included an acknowledgement that they had been paying $150 an hour extra. And it seems to me, and the settlement said that American didn't owe any more in these attorney's fees. But in saying American didn't owe any more, it looks like that settlement was taking into account that they actually got $300 an hour. Am I misunderstanding that? So there's two different issues. There's getting paid pursuant to a settlement agreement, and then there is paying defense costs pursuant to a policy. The issue here is that ICHSOP didn't pay defense costs pursuant to their policy. They refused the defense. But they actually paid $150 an hour, right? Pursuant to a settlement agreement, yes. Okay. Oh, go ahead. But so it seems like when American settled with Sierra about how much this law firm should be paid, it seems like part of what made American not owe any more money in that agreement was that they had actually gotten $300 an hour because they had paid some of it. And if that's true, it seems like American benefited from their $150 an hour, which would seem like means American should take that credit into account. No, no, Your Honor. This is where the district court, you know, dug into this issue and correctly found that just because they're paying money pursuant to a settlement agreement, that doesn't mean they're participating in the defense. And that's critical. That's the key issue, and the cases make it clear. You don't get to pick and choose what you pay for a defense. We incurred $7.4 million in expert fees and costs. They paid zero. How can they say they participated in the defense? How can they say they had any role in the defense when they paid nothing towards the $7.4 million in expert fees and costs? And so you can ask for that back. But as to the attorney's fees, I don't understand how we don't count the money that they did pay. It's like it went down the drain. Is the theory basically it went down the drain? No, it's not. The money went to settling their bad faith exposure for failing to defend. That's where the money went. But didn't the money go to Downey? I mean, as a practical matter, didn't the money go to the law firm? No. Well, a roundabout yes. I mean, it went to Sierra, who was fronting all of these defense costs. But, again, the cases make it clear that in order for you to say that you've participated in the defense, you can't pick and choose. You actually have to be part of the defense, and you're paying for everything. But so it is like it went down the drain. It's like because they didn't do that, we just ignore this set of payments that they made as if they never happened. No, Your Honor. As I mentioned, that was to settle their bad faith exposure. It's on top of their duty to defend. That's correct, Your Honor. Great way to phrase it. Maybe to put it another way, would there be additional liability they would have in a bad faith duty to defend other than just going back and paying the costs? Would there be like treble damages or double damages? Well, because they denied the defense, then that means they would be responsible for all the defense costs. So when a carrier picks up a defense, they can rely upon 2860, which sets a rate cap. When you don't pick up the defense, and so, for example, that's $150 for panel counsel. Downey Brand was charging between $600 and $800 an hour. So when you don't pick up the defense, you're responsible for all of it. If the court finds that that was a breach of the policy and that you owed a duty to defend, now you're responsible for all of it. But the bottom line is ICSOP did get some value out of that $3.4 million. They cut off additional liability they may have faced. Absolutely, because that was $150. Remember, there's still a big delta with the remaining part of the fees that were still at issue. So you've got another $300 in fees that are potentially at issue, plus if there's a finding of bad faith, anything else that's inconsequential. And, again, just to underline. But your position is because that payment went to this bad faith settlement, and it didn't help Americans. Like, in Americans' dispute about how much Downey should be paid, you don't think, even though it's mentioned in the settlement agreement that they paid that money, you think that actually was just like an irrelevant thing to include in the settlement agreement. Not irrelevant, because it was important when setting forth what they were paying and why. It wasn't irrelevant, but it didn't affect us. We still haven't been reimbursed for any of the fees that we've paid. We've paid over $6 million in fees, and they haven't paid any of that. We've paid over $7 million in extra costs. They haven't paid any of that. But wasn't the settlement about whether you should pay more in the attorney's fees? And so it just feels like their payments of the $150 per hour helped you settle that. No. No. Our settlement with Sierra was independent. So then why did it talk about how much they were paying in the settlement? Because they were settling their bad faith liability. They did not pick up the defense. They had a duty to defend, and they failed to do it. And so Sierra threatened a lawsuit, and they decided to settle it, and it's part of the same settlement agreement. That's it. So maybe I misunderstood that. So this settlement agreement that's at 896, it's with both of you? I thought it was just with you. Between Sierra and American. I didn't think it was between Sierra and also them. Maybe I misunderstood the scope of what that settlement was. Correct. So that settlement goes to what they're paying for their breach of contract, for their bad faith failure to provide a defense. They being who, though? Ixop. So at 896, it's not an agreement with American? I have to pull up the exact agreement, Your Honor. I maybe just totally misunderstood that then. But I thought it was between Sierra and American. So are you referring to in the recitals, which you might be referring to in the – So I'm trying to get to the first page of it. This is tab 12, Declaration of Ronda Culley. Okay, so then it says, Sierra Pacific Industries Liberty Settlement Agreement. Parties to this agreement are American, States Insurance. Oh, and – well, maybe it is both. Well, so and General Insurance Company of America and Sierra. So maybe it is all three. Are you guys General Insurance Company of America? No. No. So, right. So, okay. So then it is just what I thought. So I think it's just a settlement between American and Sierra. But it talks about the payments that Ixop is making. Right. And if I can, I'm just – I was trying to get to it. And if I – the issue there was there was a dispute over what had been paid over what period of time. And so that may be a recital in there as far as what they were paying, you know, toward the defense costs on top of the 150 that we had paid. But it's not a recognition that they were paying defense costs under their policy. Because they weren't. They were paid. Well, but it is a settlement to try to sort out how much this law firm should get paid. So just as a practical matter, it looks to me like they were talking about how much they'd already been paid and how much that might be owed. And they decide, well, we've got enough. We're going to just say no one owes us anything. It seems like that's what this is. I'm not sure I follow, Your Honor. I mean, it seems like they basically – as I read it, I thought what it basically was doing as a practical matter is saying, we're going to give up the claim that we owe – that American owes more attorney's fees in part because we already got $300 an hour. That's nowhere in the agreement. I mean, we, you know, paid over $13 million in defense fees and expert fees and costs, and we were resolving that and agreeing to pay our limits under the policy as part of that agreement with CIRA to contribute that towards their total indemnity exposure. There's no recognition that that 150 – that either party was using that as a term in order to resolve the party's disputes. Okay. Thank you. Sorry, I'm taking you way over. No, and I understand the confusion. Again, I think it's important to look back at what the cases say as far as whether you're providing a defense or not. And the cases that we cited in our brief, and there's several of them, say, you know, if you're going to defend, you have to defend the whole thing. You can't just pick and choose what you're paying. So they can't recast that settlement payment as participating in the defense when they weren't. You know, and the key issue there is then that means they don't get a challenge to the reasonableness of the fees and the costs that were actually incurred. So I hope I've – Okay. I think I understand your argument. I have to think about it more. But I think I understand your argument. Yeah, we addressed it, you know, in the brief. I just asked to maybe look at a couple of cases that we addressed. No, I know that those cases exist. I just can't tell if they apply here. But anyway, thank you. I'll still give you – I think I said I've taken everyone over. But why don't we give both sides three minutes for rebuttal. Thank you so much. All right. Your Honors, I want to just address a few quick points. First, I'd really like you to consider the first decision in the Maryland casualty case issued in 1998, which specified that any limitations and an additional insured endorsement don't apply to defense because they're really meant to apply to indemnity coverage. All right. I think that's a very important point. And then, two, I know Your Honors might not agree with me in terms of the reading of the defense provision, but I do want to, you know, really encourage you to look at the plain and literal meaning of the words because that's what the cases regarding umbrella coverage say. I want to point out that a lot of the cases on which Americans' position relies, if you look at them and what kind of policies they were, they were standard primary CGL policies. And there is a very, very well-known common law rule that applies to those policies regarding a potential for indemnity. That does not apply to the first step, which is strictly contractual reading of umbrella coverage. That's the first step. And I submit to you that there is no case saying that a potential for indemnity, a potential for an indemnity gap triggers umbrella coverage. We could not find any case saying that. In fact, there are cases to the contrary, including Padilla and North American Capacity. And so looking back at – Can you respond to this 150 confusion that I'm having? How do you respond to their argument that that was really settling a bad faith claim and wasn't actually about how much had already been paid to the counsel? What was settled should not matter because Sierra was also accusing American of bad faith, and that had to be settled. And Sierra – the timing is important. Sierra settled with American only after ICSOP was contributing to the defense. Hold on. Did American pay on the claims of bad faith by Sierra? They settled bad faith claims. Why shouldn't we go and drag those in too? Well, the point is that is irrelevant, Your Honors. Parties settle and release claims to avoid disputes, right? And by the way, Sierra never sued ICSOP. For a long time, before 2012, the cases were filed in August 2009, and until this case was filed in June 2012, the record shows that the parties' views were that ICSOP was an excess policy and was given notice as an excess policy. Thereafter, because there was a lot of dispute between Sierra and American about the defense that American was providing – keep in mind that American was also obligated to the – under the common law rules to provide a full and immediate defense, and Sierra vigorously disputed that American was not doing that. At that point, ICSOP, as an excess insurer – keep in mind they did provide coverage, they paid $10 million, and there were other policies that are not at issue that also paid. So there was money paid under these policies because of the excess – Defense costs, and that's what we're here for. Well, they did pay defense invoices, Your Honor, and I think that's really applying labels in a manner that's not consistent with the case law. Can you explain – sorry, I know we're already over, but explain what that means, they paid defense invoices. Well, Your Honor, ICSOP took the position that it had the right, but not the duty, to participate in the defense. And so in that context, an excess insurer often –  may actually pay defense costs because it wants to limit the exposure. And when it does that, good business sense says that you also release claims to avoid future disputes, and that's exactly what happened here. You're talking about in the settlement. So when you're saying you paid invoices, you're saying that's just how you calculated the settlement. Well, it wasn't a settlement for a set amount, Your Honor. That's important to keep in mind. It was a settlement based on the extra $150, whatever that ended up being. It was on a future-going basis. The cases were started in August 2009. There was an ongoing dispute between Sierra and American for a while. By February 2011, Sierra filed a lawsuit against American, and later in November of that year, Sierra and ICSOP agreed to a defense agreement whereby ICSOP paid defense invoices since November 2010 through that time, and on a future-looking basis. So it was paying future defense invoices without a cap or an amount. And that is a defense, Your Honors. As you pointed out, the cases that speak about whether an insurer provides a full defense and not defending when it doesn't provide that, that is a legal rule that applies to disputing the reasonableness of defense costs. We're not disputing the reasonableness of defense costs. We're under the Scottsdale Rule, which says that you have to look at the full defense coverage that Sierra was owed, and we submit that that was a factual question, Your Honor. If ICSOP had a duty to defend, the district court is obligated to look at what Sierra was owed from all its insurers, and then consider whether American paid more than its fair share of that amount. And, Your Honor, just on the other insurance point, I would like to say, draw your attention to the case of American Casualty Company of Reading, Pennsylvania, which enforced an access-only provision and umbrella policy. You're over your time.  All right. Thank you, Your Honors. Just briefly, Your Honors, and it's my hope I can try to provide some clarity, a few more minutes to kind of cogitate on this issue that I think you're struggling with a little bit. And the way I understand it, their argument is that they should get a credit for the 3.4 that they paid in defense costs. And the reason why that doesn't work is because the cases say you only get a credit if you're actually providing a defense. They weren't providing a defense. But their argument is that money was going to attorney's fees. That's what makes this unusual, is it's sort of a hybrid where, yes, it was bad faith claims that were being settled, but their settlement was to pay some unknown ongoing obligation towards attorney's fees. So it's a – I tend to be more with you on this, honestly, but it is a hybrid. Yeah, it's – right, it is a little unique. And what I'd say there is I'd fall back and look at what the cases say. And the cases say for you to defend, you have to provide a complete defense. That's what's critical here. And they weren't doing that. Even if they were to say that this money was – Yeah, no, I understand your argument about that. But do you have any case where, even though they weren't defending, and I understand your position that that means they just really can't say anything about this issue at all, but do you have a case where there was something like this where, as a practical matter, both sides were paying some attorney's fees and still it didn't count? No, and I agree. As far as – I haven't seen a case where a party settles their breach of contract, bad faith, failure to defend, exposure, and that settlement requires them to pay fees. Ongoing fees. Right. And so we don't have that. But what we do have are cases that talk about what does it mean to provide a defense? What does it mean to defend fully? And what those cases say – and that's Haskell, that's St. Paul – and they say you don't get to choose, you don't get to pick what portions of the defense that you're providing. And, again – I mean, one way to look at this, perhaps, is that they didn't do the best job they could in settling that. They could have made clear, I presume, that the $3.4 million or whatever those amount would have been would go towards defense costs. And that might be a different case. Possibly, but I think they also have to recognize – You'd say that still doesn't count. You can't contract your way into it. Yeah, exactly. If you're not doing it. But it also doesn't include any of the expert fees or costs. Remember, for a defense, only one portion are the fees. We've got over $7 million in expert fees and costs that they paid nothing to. How can they say that they participated in the defense when they didn't even contribute to that? So they're trying to recast this as, well, we participated, we should get a credit. Well, no. The cases reject that. They say, you don't get to do that. You don't get to say, well, I'm picking up this part, therefore I'm participating in the defense. Of course, absolutely not. That's Haskell. That's St. Paul that they cite to. So with that, I understand we're out of time. I just was hoping to provide a little bit more clarity on that point. Thank you. Thank you, both sides, for the helpful arguments in this complicated case. The case is submitted, and we are adjourned. Thank you so much. All rise.
judges: Schroeder, Friedland, Nelson